**FOERSTEL et al. v. HOUSTON et al.**
**No. 7499.**

Circuit Court of Appeals, Sixth Circuit.
Jan. 10, 1939.

Richard D. Shewmaker, of St. Louis, Mo. (Thompson, Mitchell, Thompson & Young, Fred Armstrong, Jr., and Richard D. Shewmaker, all of St. Louis, Mo., on the brief), for appellants.

J. S. Allen, of Memphis, Tenn. (J. S. Allen and Armstrong, McCadden, Allen, Braden & Goodman, all of Memphis, Tenn., on the brief), for appellees.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

Suit to foreclose a deed of trust securing an indebtedness evidenced by notes executed by William Wilson. Plaintiff-appellants are the present trustee (successor to Federal Commerce Trust Company) and Joseph A. Foerstel the holder of $5,000 of the notes. Appellees include George T. Houston personally and as trustee, Horace K. Houston and Phillip D. Houston.

The trust property was sold under a foreclosure decree for $45,000, leaving a deficiency of $89,813.83.

The bill sought a deficiency decree against the Houstons upon the ground (1) that they and Wilson were joint adventurers; and (2) that they were obligated both by law and contract to indemnify Wilson as their agent from loss on account of the notes made for their accommodation.

The Houstons denied that they were either joint adventurers with Wilson or that he was authorized to act as their agent.

The question is whether the Court was correct in refusing a deficiency decree against appellees.

George T. Houston was the father of Horace K. and Phillip D. They owned timber lands in Mississippi, in the name of Delta Land & Foresting Company (herein called Delta). Their enterprises included a lumber business in Memphis and certain transactions in real estate conducted in the name of George T. Houston & Company, a co-partnership, with offices in the Union & Planters Bank & Trust Company building in Memphis.

The Houstons became acquainted with Wilson in Clarksdale, Miss., where as a real estate agent he had sold land for them. Wilson moved to Memphis, engaging in the real estate business there. He came to the Houstons and asked if he could sell more of their Mississippi land on the same basis he had old it at Clarksdale. George T. Houston explained that Wilson's practice had been to close with a buyer, turn over the proceeds and receive his commission; that he told Wilson he could go to work on this basis but that Wilson was in needy circumstances and asked an advance. He was given a drawing account and a desk in the Houston office and to off-set his account was placed in charge of an experimental farm of the Houstons. He drew around $200 a month for about six months prior to the transactions out of which this suit arose. Out of the proceeds of any deal he was to settle for any balance owing upon his advancements.

In December, 1924, Wilson in connection with Hammond, another agent, proposed to Leslie M. Stratton, President of the Stratton-Warren Hardware Company (herein called Stratton), to purchase its property (land and buildings) on Calhoun Avenue in Memphis for $185,000 and 3,000 acres of cut-over lands owned by Delta. Stratton was willing to trade but when the matter was presented to the Houstons, G. T. Houston said to Wilson: "Now you can handle it like you have been handling for the Company, on your own account, but we are trying to reduce our accounts and we are not accepting any more liabilities."

Further he testified, "If they could handle it so that there would be no responsibility to us, like he had done before in numerous deals, that we would put in this 3,000 acres. * * * What we were to get out of it we left an open question. He indicated he could get about $35.00 an

acre in the trade. I told him I was willing to go into it to that extent."

It is evident from the testimony of Hammond that the Houstons' chief interest was in the disposal of their cut-over lands.

On December 22, 1924, a contract for the purchase of the Calhoun Avenue property was signed by Wilson, Trustee, and by Stratton, whereby the conveyance was to be to William Wilson, Trustee, or his nominee. As earnest money Wilson put up the Houstons' check for $1,000. At the trial George T. Houston explained that this was an advance to Wilson "to help him in a financial way to get the deal through." An important provision of this contract was that the Mississippi Valley Furniture Company (herein called Mississippi), a Stratton interest, would take "a five year lease on these two buildings at an annual rental of $22,000.00 net to the owner, the tenant to pay taxes, insurance, and all upkeep and repairs caused by general wear and tear. * * *"

But Wilson could not raise the cash portion of the price. He hoped to borrow it from the Union & Planters Bank & Trust Company (herein called Union). He conferred with Vardaman, Vice-President, in charge of the bond department of Union, but both Wilson and Vardaman died before the suit was brought and just what passed between them at the outset of their negotiations does not clearly appear. However, Vardaman passed the matter of the loan on to Tobey, Vice-President of the Federal Commerce & Trust Company of St. Louis (herein called Federal), the predecessor of plaintiff, trustee. Tobey also died before the suit was brought.

Federal would not consider a loan for more than $155,000. Wilson was furnished with an application blank used by Federal upon which he applied for that amount. The application stated that the loan was to be evidenced by notes or bonds and secured by a first mortgage or deed of trust and that its purpose was to pay a part of the purchase price. It contained no provision relating to the liability or non-liability of the Houstons. It was signed by Wilson on the 20th day of February, 1925, and was submitted to Tobey and was not satisfactory, because X-marks had been struck through a provision requiring a sinking fund.

Tobey thereupon came to Memphis and had a conference with Wilson and with at least one of the Houstons. The bones of contention were,—(1) the provision for a sinking fund; and (2) whether Wilson should assign to Federal the rentals from the lease he was to execute to Mississippi.

Phillip D. Houston testified that Tobey suggested,—"If we would take over or if we would endorse, or if we would be liable on notes, then the question of the assignment of rents or of the sinking fund would not be involved," and that he replied that they, the Houstons, would not guarantee the notes. This terminated the conference but Wilson and the Houstons had another conference with Vardaman, in consequence of which Vardaman on February 23d wrote to Tobey:

"* * * With further reference to this loan, I beg to advise that I have submitted the new applications to Mr. Wilson and it is agreeable to him and the Houstons to go ahead and sign a new application just as prepared by you except as to the sinking fund. It is their understanding of the conversation which they had with you, that you agreed to let this provision stay in the application and the mortgage but it was to be understood between you and them that so long as they promptly met all installments of principal and interest, and kept all taxes and insurance paid up, and made no transfer of the property—they would not have to place these sinking fund payments with you nor would they have to deliver to you the actual lease and rent notes. However, in the event they fell down on any of their covenants at any time then you would have the right to call for the lease and rent notes and also require the sinking fund to be placed with you. You will recall that the lease is made subject to your deed of trust so that any holder of said lease or notes, or any of them, would have notice of your right to said lease and the proceeds thereof. If this item is settled as above set out, we will go ahead and have Mr. Long approve the title and arrange to close the trade Saturday.

"If this is agreeable to you they will let the Sinking Fund clause stay in the application as drawn and let a similar provision appear in the trust deed and you can simply give them a letter waiving this requirement so long as they faithfully and promptly comply with their covenants. Please wire me or phone me at my expense regarding this matter tomorrow and I will forward application if you want it. * * *"

Upon receipt of this letter, Tobey, on February 24, 1925, wired Vardaman as follows:

"Your letter received Existing lease on property of great importance to this loan We would insist that lease and notes be assigned to us and deposits made monthly for sinking fund We could place rent notes your Bank for collection having Bank remit us proper amounts for sinking fund and crediting owners with balance We would allow three percent interest daily balances on sinking fund Let application come to us tonights mail so can be passed on at our meeting tomorrow."

Thereupon Vardaman, Wilson and the Houstons had another conference as a result of which Vardaman wrote to Tobey on February 24th as follows:

"* * * As to the assignment of the lease, I talked to Mr. Houston this afternoon after I talked to you" (evidently a phone conversation) "and finally got them to agree to assign the lease to you, this assignment to be incorporated in the deed of trust, and to deliver all rent notes to us to be held for your account. In other words, when this trade is closed all of the rent notes would be delivered to us with the understanding and agreement that we would collect the notes and remit you each month for the proper amount due on the sinking fund, the balance to be credited to the account of the holder. It will also be agreed that in the event of any failure on the borrower's part to fulfill any of his covenants all of the notes would be delivered to you together with the lease. If you can handle this matter as above set out please submit same to your committee early tomorrow and wire me their decision. If you can not handle it on these terms please wire me so that I may know that the trade is off."

Upon receipt of this letter Tobey wrote Vardaman on February 25th, as follows:

"* * * I have just wired you as follows: 'Application William T. Wilson approved method of collection sinking fund outlined in your letter February 24th satisfactory Please advise Mr. Wilson and thank him and his associates for the business. * * *' Please advise me if the title is now vested in William T. Wilson. If this has not been done, it should be done promptly and the lease and notes properly executed by the officers of the Mississippi Valley Furniture Company and by Mr. Wilson together with an assignment of this lease and the notes to the Federal Commerce Trust Company, which we will place with you just as outlined in your letter of February 24th. * * *"

The new application, signed by Wilson and approved by Tobey, contained the sinking fund provision which was elided from the first one, but, like the first one, contained no provision relating to liability of the Houstons.

Stratton wanted his money in advance of the formal completion of the deal so George T. Houston & Company on February 27th discounted a note for $185,000 with Union to run for a month or so until Wilson could conclude his arrangements with Federal. The proceeds of this note were paid to Stratton.

On March 7th Stratton executed its deed to William Wilson, Trustee, conveying the Calhoun Avenue property. On February 28th Delta executed its deed to Stratton for the cut-over lands.

On February 28th Wilson, Trustee, executed the lease to Mississippi. He employed Mr. McCadden, a lawyer, to prepare it. He did not have with him a copy of the contract providing for its execution but McCadden procured a copy from Mr. Long of the Title Department of Union, which bank was to guarantee Wilson's title.

McCadden, at the suggestion of Long, consulted with Mr. Heiskell, attorney for Stratton, and then prepared the lease in accordance with the contract. (Heiskell died before the suit was brought.) Also, at Long's suggestion, McCadden prepared the deed from Stratton to Wilson, Trustee, but about three weeks after the execution of these instruments, McCadden, accompanied by Wilson, for the first time met the Houstons in their office. George T. Houston then related to him in detail his understanding with Wilson, to wit, that in the trade with Stratton the Houstons were to put in the cut-over lands, that Wilson was to borrow the additional purchase price and pay the Houstons for the cut-over lands out of profits which he had assured the Houstons he would readily make in a resale of the Calhoun Avenue property; that because Wilson had failed to borrow the full amount required, the Houstons had agreed to advance about $40,000 to "take up the slack" and to take a second mortgage from Wilson for security.

McCadden testified that Houston said,—"Now, I am not to be individually liable in this matter at all. This is Wilson's venture." That he then advised Houston that the contract with Stratton, the deed from Stratton and the lease to Mississippi all ran in the name of Wilson, Trustee, and suggested that notice thereof be given to Vardaman and to the title department of Union; that Houston replied,—"Now, young man, you tell the parties, whoever they are, that I am not to be individually engaged in this beyond the value of my land, beyond what I put in; I will buy these second mortgage notes"; that he, McCadden, replied, "All right, sir" and reported the conversation to both Vardaman and Long; whereupon Long requested him to redraft the deed from Stratton so as to show that it was made to William Wilson, individually, and that the deed so corrected was executed on May 4th. The lease from Wilson, Trustee, to Mississippi was also corrected to show that it was executed by William Wilson.

On April 15th Long wrote Tobey of the necessity for these corrections for the reason "that the deed was made originally to William Wilson, Trustee, and I am advised by Ed McCadden that the bond and papers have been written to be executed by William Wilson as an individual. * * *"

On May 1st Tobey wired Long, "Please wire if correction deed has been recorded."

The necessary corrections having finally been made, William Wilson and wife on May 4th executed the deed of trust to Federal and Wilson executed the first mortgage notes secured thereby. Federal took a fee out of the proceeds and remitted the balance, $146,786.66, to Union, which was credited upon the Houston Company's temporary loan of $185,000. The balance for which the Houstons remained obligated was about $40,000 and they took Wilson's notes therefor, secured by a second mortgage on the Calhoun Avenue property.

Thus, the Houstons were involved to the extent of their 3,000 acres, which, according to a prospectus issued by Federal in aid of the sale of the Wilson notes, was worth about $90,000 plus the $40,000 advance on the second mortgage, but as we have noted, they expressly disclaimed any liability upon Wilson's engagements. Not inconsistent with their position, the Houstons on May 9th, incorporated Houston Securities Company in which they were sole stockholders. George T. Houston was

made President, his sons filled other offices, and Wilson was elected Secretary and General Manager. After its organization the Company accepted an offer of Wilson to quitclaim to it the Calhoun Avenue property upon consideration that it assume the notes and interest coupons on both mortgages plus Wilson's indebtedness to the Houstons and to Delta, and on May 18th Wilson and wife executed the quitclaim deed. The Company did not have a very active existence. During 1925 it acquired two other pieces of property. Cut-over lands went into these deals negotiated by Wilson but on May 28, 1926, the Company adopted a resolution ordering its dissolution and directing its officers to quitclaim to "George T. Houston, Trustee, these three pieces of property for the benefit of the copartners in George T. Houston & Company," and stated, "that the consideration for the above transfer is merely to put the title in George T. Houston as Trustee for the three copartners of George T. Houston & Company, it being determined by the stockholders that the formation of the company was a mistake." There was no assumption by the grantee or the partners of any of the obligations affecting the property.

The evidence is that the Securities Company was dissolved because it "was a dead expense," there being necessary to its corporate existence certain reports, bookkeeping and taxes. Its only revenue was the difference between the rents paid by Mississippi and the amount of the sinking fund requirements. These rents were collected by Union and amounted to $1,833.33 per month. The sinking fund requirements were $1,341.66 per month and the balance was credited to Federal by Union. On Federal's books it was credited to "William Wilson Sinking Fund Account."

On February 6, 1929, Horace K. Houston advised Federal by letter of Wilson's death and of the transactions by which the title to the Calhoun Avenue property had become vested in George T. Houston, Trustee, subject to the trust deed.

The Mississippi lease expired on March 1, 1930, but Houston & Company continued to pay into the sinking fund for about two years, making total payments including principal and interest, of $37,550. During this period the Houstons tried unsuccessfully to rent the buildings and were finally forced to move their own offices into them and to start a small warehousing enterprise

to keep them occupied and prevent damage and depreciation.

Early in 1932 the Houstons ceased paying into the sinking fund and suggested that the payments be cut down and later that they be paid by notes. These suggestions were rejected by Mercantile-Commerce, successor to Federal. On February 20, 1932, its Vice-President wrote:

"We regret very much that we cannot accept your suggestion about paying your sinking fund deposits by note for March 16. As you know, these bonds have all been sold to the public and our bank is merely the trustee, and we must abide strictly by the terms of the deed of trust, otherwise we might be subject to criticism or be charged with neglect in the event there was a loss later on by reason of our having agreed to accept notes rather than cash. We have no doubt that the name, George T. Houston & Company, would have considerable weight but we have no recourse other than to follow out the mortgage with respect to the sinking fund payments."

It is hardly conceivable that he would have written in this vein had he deemed the Houstons already bound.

Phillip D. Houston testified that neither Mercantile-Commerce nor its predecessor made any claim that either George T. Houston or his brother or himself were liable on the Wilson notes; that this had not been discussed in any way that he knew of until it came up in connection with the suit.

A year later the Houstons abandoned hope of holding the property and through their attorney wrote Mercantile-Commerce on March 3, 1933, that they were unwilling, even if they could, to make any effort to protect any equity in the property.

A little more than a year later this suit was brought.

Such are the facts.

■ We think the decree was right. It is clear enough that under his agreement with the Houstons, Wilson had no authority to borrow money upon their credit. This matter was not even left in doubt. He was specifically prohibited from incurring any such responsibility and he thoroughly understood it. But, the agreement aside, we fail to find anything in the evidence touching the relations between the Houstons and Wilson to indicate that Wilson had apparent authority to borrow on their behalf or to justify Federal in relying upon the belief that he had such power. Any inference that he had it is refuted by the evidence that he did not. Both Vardaman and Long, acting in behalf of Federal, knew that he did not, and Tobey himself had notice, sufficient under Topic 2, Sec. 9 (Knowledge and Notice) of the Restatement of the Law of Agency, at least to put him on guard. We think he knew it before his conversation with Phillip Houston, above narrated, and he certainly knew it after that.

■ Further, the burden was upon appellant to show that it relied upon the apparent authority of Wilson to bind the Houstons. American Nat. Bank v. Bartlett, 10 Cir., 40 F.2d 21, 24. It made no such proof. The reason is plain,—it knew that it could not subject the Houstons to liability after knowledge of the limitations upon Wilson's authority had been brought home to it. Restatement of the Law of Agency, Ch. 6, Sec. 166. After that it made no claim against the Houstons nor any representations in its prospectus that the Houstons were bound. It was content to rely upon other and different security.

■ It is urged that when the Houston Securities Company was dissolved and its property transferred to George T. Houston, Trustee, for the benefit of the Houston partnership, the partners became liable upon Wilson's first mortgage notes previously assumed by the Securities Company. But such is not the law.

■ Merely taking over the property subject to the mortgage constituted no promise to pay the mortgage debts. Shepherd v. May, 115 U.S. 505, 510, 6 S.Ct. 119, 29 L. Ed. 456; Merrimon v. Parkey, 136 Tenn. 645, 658, 191 S.W. 327; Williston on Contracts, Rev.Ed., Sec. 382, p. 1108.

The decree is affirmed.